Good morning, Your Honors, and may it please the Court, I am Austin Moore from Stevie Siegel Hanson. I am representing the appellant in this case, Jennifer Clemens, and I would like to reserve three minutes of rebuttal time. Very fine. Three minutes it shall be. Go ahead, sir. This case involves one of the most serious data breaches imaginable. A well-known hacking group broke into a pharmaceutical company's computer networks and accessed, then exfiltrated, the company's most sensitive internal data. This information included the personal and financial information of thousands of current and former employees. Names, addresses, dates of birth, social security numbers, tax forms, such as W-2s and W-4s, bank account numbers, credit card numbers, driver's licenses, insurance information, not only for the employee but also for their beneficiaries and dependents, and even copies of passports. And after exfiltrating the data, the hackers held it for ransom, which the company declined to pay, and the hackers released the data on an underground portion of the Internet known as the dark web, where any person with an Internet connection can access it, download it, and misuse it at their discretion. We're very excited to hear this, which is why the three of us are kind enough to let you go this far. We know the facts. We're good. Great. Let me ask you this question. Where are we in this constant pursuit of line drawing, right? So as we think about Riley, as we think about Susan B. Anthony Lewis and all the cases in between, how are you thinking about this notion of line drawing, right? So obviously the key inquiry is imminent injury, because if you don't have that, you can't get to the notion of injury in fact, and that would kind of be the end. Sure, Jeffrey. I think, you know, the fundamental flaw here is trying to say there's a bright line rule, because the Supreme Court has recognized standing is not dispensed in gross. It's a case-by-case inquiry. It's a claim-by-claim inquiry. But it always has to be concrete, right? There always has to be a concrete injury, and concreteness, the concreteness of the injury usually is linked, I think, to some actual injury, not just the notion that there may be harm later. Concreteness is a strange creature in the context of intangible harms, but I mean, isn't one of the major points that you struggle with here showing some sort of concrete harm that came from this? Maybe intangible harms have a different understanding of concreteness, but Lujan, in many cases before it, and every case after it, has said it has to be concrete. Absolutely, and I'd like to discuss why several of the injuries we allege are actual. They're present. They do not depend in any way on the risk of future harm. And look, the TransUnion versus Ramirez case, that came down while this appeal was pending, and I think it reaffirms that the harms we allege in this case already provide concrete standing, which are concrete injuries under Article III. So in TransUnion, the Supreme Court considered the standing of two separate groups of plaintiffs who were alleging violations of a federal statute, the Fair Credit Reporting Act. The first group had inaccurate reports prepared about them that were transmitted to a third-party creditor. The second group had inaccurate reports prepared that were not transmitted to anyone. And TransUnion challenged the standing of both groups in assessing whether these groups had standing that the Supreme Court reiterated. Like you said, Judge Phillips, no concrete harm, no standing. But then the court identified, how do we determine what is concrete? Well, sometimes it's straightforward. Traditional tangible harms, like monetary injuries, those easily qualify as concrete injuries, according to the Supreme Court. The court also recognized various intangible harms can be concrete. It said, chief among them are injuries with a close relationship to harms traditionally recognized as providing a basis for lawsuits in American courts. And it gave examples, privacy torts, reputational harms, disclosure of private information, intrusion upon seclusion, are all intangible harms recognized as injuries in common law. And I think here's the important point. The Supreme Court unanimously held that those in the first group who had their information disseminated to a third party experienced a concrete injury, even absent some additional harm, i.e., identity theft or fraud. Improper disclosures are a type of intangible harm that is well recognized at common law. It makes sense for us to look to analogies in common law if what we're presented with is simply a violation of a statute. Some aspect of it might be considered simply procedural, some regulation, something beyond just the enforcement of the law. But if it's a common law claim to begin with, like here, negligence, why should we be looking to analogies to common law? Well, I'll first say we allege breach of confidence. This is the very privacy tort that the Supreme Court is referring to. And what the Supreme Court said is dissemination alone is injury. And that's what we allege here. And this court has actually discussed that claim at length in two recent opinions, the Kamal v. J. Pru group case from 2019, the Horizon Data Breach case from 2017. And this court has reaffirmed that principle multiple times. But what's the idea from a transunion, the dissemination equated with concerns about the effect on reputation? So it's in the nature of a defamation or libel where it may not be quantifiable, but that's a concrete injury that's long recognized, where it's that data has been disclosed. What is the actual injury? What is the concrete injury that goes with that? Yeah, so the Kamal case discussed this breach of confidence. It's the unconsented disclosure of confidential information to a third party. So this claim is not always going to be available. The two parties have to have a confidential relationship where they exchange information, and then that information is disseminated without consent. So just to get in on the line drawing here, if there had just been a hack without publication on the dark net, are you saying that there wouldn't be Article III standing if it was just in the possession of the hackers but they still hadn't disseminated it? I mean, it may not matter for purposes of your case because you're probably telling me it doesn't matter because they're already on the dark net. But just in terms of line drawing, because you told us at the outset this is case by case and very case specific, I'd like to know what if we had that one little fact different? Would there be standing in that instance? Well, here I think the actual dissemination gives rise to this tort claim. I think in that case you'd be relying almost solely on the risk of imminent harm, and it just depends on the facts leading up to it. I mean, do we know? Like in Riley, we did not know who the hackers were. And that's what I want to follow up on. When we talk about the risk of the imminent harm, is the harm the potential dissemination on the dark net, or is the harm some degree of financial or other tangible injury to the plaintiff? I think it's the latter. I think that's typically the harm we're talking about because that's the type of harm that you'd come into court and seek redress for, although I think information can be misused in other ways that would qualify as injuries recognized in common law. I'm surprised by that response because it seems as a follow-up to Judge Phipps' argument. You'd say dissemination on the dark web is the critical injury because if you're drawing a distinction between where the information is, is it kept, is it disseminated in one form or another form, the dark web, I don't know much about it because I haven't been there. But what I understand is it's entirely secret. It's entirely what one could infer. It's entirely nefarious. Maybe I'm wrong about that. You'll correct me if I'm wrong. But isn't that the key to this? Because if it's not, then I'm not quite sure I understand where we're going with this. Because if it's just a breach of confidence, that is the hackers have it and that's the risk of imminent injury, it would seem that between looking at Susan B. Anthony, Riley, and the other cases you've alluded to, we couldn't get there. Yeah, I totally agree in this case that that's a key fact. That supports injuries for many of the causes of action we assert. Whether that's the key fact in every case, it just depends on the facts leading up to it. I've litigated a lot of data breach cases where we don't know where the information winds up. We don't know who was behind the attack. But there's other circumstantial evidence that the information is being misused. So, again, it just is a case-by-case basis. And I think the facts here, as we can see, are about as strong as they can get in the data breach world. But does this turn on the nature of the injury that you have pleaded? In other words, here you haven't pleaded, as I read the complaint, just a breach of privacy interests or the disclosure of confidential information. What's pleaded is as to the risk of identity theft, right? Well, no, I think we do allege a breach of confidence, like I mentioned, which the dissemination is the injury. We allege a breach of contract claim based on ExecuFarm's failure to protect the data, which it promised to do. The injury there is the breach. It's failure to do that. And then our client has multiple remedies at her disposal, including the traditional tangible injuries of monetary harm. She spent money as a direct consequence of that breach of contract. Those are classic consequential damages. And a jury can accept it or reject it, but it should not dismiss the case on standing grounds. I see I only have 30 seconds. I will reserve that, if that's okay. Actually, why don't you stay? Sure, absolutely. I'd like to ask a question again. This is on page 9 of your brief, and it's a screenshot from the cloth leaks page. I found this interesting. I don't know. This looks like it was in the JA. But it basically says this is what's on the dark web. So Judge Greenaway says he hasn't been to the dark web. A lot of people haven't been, but you give a screenshot of what's on the dark web for those of us that just want to take a quick sense of it. And it says page views 337. And it gives, it says 18,895 emails, correspondence, financial accounting, user documents of information, a total of 11 archives, total size 162 gigabytes. But at the end of the day, it says page views 337. I guess my question is, it's there. But do we have any evidence that anyone ever went to the dark web and looked at your client's information? According to the JA, only 337 people have ever looked at this. Do we have any evidence that anyone ever looked or used your client's information off the dark web? As Judge Greenaway says, you know, not everyone goes there. And so the ones that do, why don't we have something more concrete to say yes, and we know that people have used my client's info? I'll make one note on the 337. This is a cyber intelligence firm that took a screenshot of this. I think likely within hours of them posting it. So that page views, you know, it could be thousands, could be tens of thousands. But this was in the record, though. Absolutely, Judge. Do we know whether anyone has downloaded that and then looked at our client's information? At the pleading stage, we do not know. And we certainly think it's plausible that occurred. That's the reason it was posted. That's the reason CLOP here is listing what data is available. And, Judge Greenaway, like you mentioned, I think most people go to these types of websites for nefarious reasons. They're looking to scam people. They're looking to get access to information that they can misuse to their benefit, which is exactly why our client had to take so many immediate preventative measures, including spending her own time and money at the direction of Executive Farm. It told her to do those things, and she did. We know from Riley that taking on those mitigation efforts is not going to itself bootstrap one into having standing. We need to have first a cognizable injury. So going back to what is the nature of that injury, it sounded like you were saying before that pleading, what you've characterized as a breach of confidence, is enough. But that's just to say that there was a breach of duty. How is that any different than a procedural violation of a statute? So there's a legal right, but what's the injury that comes from that violation? Well, Judge Grouse, again, I think it's claim by claim. So on the negligence claim, the traditional negligence principles say if you go out and take reasonable measures that a reasonable person would take to prevent the harm that's averred by the tortious conduct of the defendant, those are recoverable. And that's typically a jury question. I don't think you could really question what Clemens did here, what was reasonable, and she spent money. So that money is a tangible injury. Again, the breach of confidence claim, the breach of contract, I think you're right. I think when they fail to protect the data, that's the injury. But she also has damages she can recover as a result of that injury. I think the breach of confidence claim, right, the Supreme Court said that actual dissemination is enough for a federal statute, and it's looking at the common law claims. Well, this is the common law claim that supports it. So that dissemination is enough for that claim. And, again, I think it's just a claim by claim analysis, and every claim we allege does have a concrete injury. But you're not claiming here that it's in the nature of some harmed reputation. No, because the Fair Credit Reporting Act looks to that type of harm, and that's one example. That's typically a defamation-type tort. But it also, the Supreme Court noted that unauthorized dissemination of information is another privacy tort, and that's the one we allege here. Can you help us understand, after transunion, what is really the distinction between our analysis of imminence and concreteness? Right. So I mentioned those two groups of people in transunion. The first, dissemination, concrete injury. No dissemination. The Supreme Court said there's no injury because there's no common law analog that allows for recovery of inaccurate information absent dissemination. The court did note, though, that the risk of future harm is not enough, but if that risk causes a separate concrete harm, that is enough. So even if you were looking at this case and you were equating Clemens as a Group 2 person, I don't think she is. She's a Group 1 person because she had the dissemination. But even if she was a Group 2 person, she suffered another concrete injury of trying to protect herself against the risk of the unauthorized disclosure. So I think either way, she would satisfy that transunion test. So does that mean the only damages that she'd have is the expenditure in trying to protect her information? Those are the traditional monetary injuries. So I think she'll be able to recover those. She'll be able to recoup her losses. But I also think she'll have other available remedies at her disposal. For the privacy tort claims, what this court said in Horizon is that those are very difficult to value. So the jury will say what that value is, but you don't need to show actual damages in order to have an injury for a violation of that claim. But if that's the injury, then don't you need to agree that it's actual injury for it to be viewed by CLOP in the first instance, regardless of anything that happened afterwards? That any third party who's looking at it without the consumer or employee's consent, that that's the actual and concrete injury? Absolutely. And that's why I think this idea that all of our claims rest on some future harm occurring, like identity theft or fraud, is mostly irrelevant because the harms here have already occurred. Well, what if they look at it, but there's nothing you can point to as either psychological harm or monetary damages? Is there standing just from someone looking at confidential data? Yes, that's a concrete injury under the common law. I mean, at one level, it's nice to just talk about Article III standing in the abstract, right? Because we have this test that seems to apply to really any cause of action, that the person wants to invoke the jurisdiction of the federal courts for. But your complaint, at least the one I've seen in the record, has seven counts. One of them is for declaratory judgment. I'm not sure that's a freestanding cause of action. But it goes like negligence, negligence per se. I think it's breach of implied contract, breach of contract, probably breach of fiduciary duties in there, and then breach of confidences in there. So just thinking about universe of six and pushing off the declaratory judgment one to the second, do you think that you have to show standing to pursue each one of those claims, or do you just kind of show standing generally, and then you can proceed with each one of those claims? Yeah, so I think it's claim by claim. I think you have to show what's your injury for each claim. And my one criticism of some of the data breach opinions, it has seemed to be an all or nothing approach where they don't do that claim by claim analysis. Because, you know, our injury for negligence may be different than our privacy to our claim, but I think in this case there's independent injuries that are all sufficient to confer standing for each claim alleged. So in the breach of fiduciary duty space, I don't see much in the briefing on that. So, I mean, usually breach of fiduciary duty isn't, you know, Do you have any cases that talk about how breach of fiduciary duty could ever apply to an intangible harm? Well, I think the breach of fiduciary – But usually, like, you know, you misadminister my estate, you botch the administration of a RISA program, something like that. But you want standing for each one of what I'm calling your six sets of claims. Where is this kind of notion that breach of fiduciary duty tolerates intangible harms? Sure. So I do not have a case citation for you, but I can give you the background on that claim, which is it's an employer-employee relationship. I don't think every data breach case is going to have that type of relationship. This information was given in confidence. So, like the breach of confidence claim, that created a duty that we believe does rise to the level of fiduciary duty. This is under Pennsylvania law, and there's case law that supports that. So, good, good, good. Those are elements of the claim, right? Question is, where's the case that says for Article III standing purposes for breach of fiduciary duty, intangible harms are perfect? They work really, really – you might have some of that from TransUnion when it references dissemination, other things like this, for traditional tort claims. But you've told us that you need to have Article III standing for each one of your claims, and I'm trying to find out where's the basis in the law for Article III standing for an intangible harm for breach of fiduciary duty? I wish I had a case, and I wish we would have addressed this claim more specifically in our briefing. We did not. Breach of fiduciary duty generally has an array of available remedies, and like the breach of contract claim, you can take that claim to a jury. The breach of the duty is itself a harm for that claim. And I know you're asking for a case that says that allows for intangible type harms, but my understanding is that claim is treated the same as a breach of contract claim here, which once the breach occurs, that's an injury, and you can ask the jury for injunctive relief potentially, for damages. You know, what are the damages that were caused by a breach of fiduciary duty? Again, she spent time and money. We think those are compensable for that claim just as it would be for the other causes of action. I hate to harp on this, but I'm just thinking about your standard breach of fiduciary duty claim where someone says, I trusted you with usually some degree of responsibility either over a person's health sometimes or over their assets or over something like this. It's a faith-based relationship, a good faith-based relationship. And so I don't know how a good faith relationship falters based on just an intangible harm. I think you're right. I mean, it's based on the relationship providing confidential information to someone in a position of trust, just like you would a doctor. They fail to live up to that level of trust. I do think that gives rise to a claim. We don't see it as much in these data breach cases, so I don't think, you know, there's a lot of cases sort of addressing that. I mean, is HIPAA a good workaround there in the sense of that it's statutory, but there's some degree of trust there, much like a fiduciary context, and maybe we tolerate intangible release of medical information is actionable under Article III in the HIPAA context? Yeah, and that has come up. That has come up, and, you know, I've had cases involving medical information where we allege a negligence per se claim, and we say HIPAA sets the standard there. And they fail to live up to that standard of HIPAA, and, you know, that's presumed negligence under the facts of that case. I do think it's a similar concept here. Again, you're sharing confidential information with someone in a position of trust. If they break that trust, that's the injury. It's the breach of that duty is the injury, and then you've got various remedies at your disposal you can take to the jury. What if we think that there needs to be something closer to an identity theft, not just a mere disclosure, but as we've suggested, and Riley and all of our sister circuits have required, that there be some proof as to the likelihood, the imminence of actual identity theft, even if there isn't proof that the identity has been misused yet. But if that's the case, what's the test for imminence? Should we adopt a test like McMorris? If we're looking at that, assume that we're looking at that as the injury, the level of injury that would be required for a data breach case. And that's essentially what we're asserting, that even if we didn't have these actual injuries, we would still be at a sufficiently imminent risk of harm to independently confer standing. And you're asking what the cutoff is. I do think it's sort of those factors that you've looked at from McMorris. And McMorris, again, is a Second Circuit opinion from April of this year, from the Second Circuit. They look back through the last decade of case law and came up with sort of the three guidelines. Was the data at issue compromised as the result of a targeted attack, or did someone leave a laptop out and it got stolen? In Riley, we didn't know the identity of the hacker, so we had no idea if there was a malicious intent behind it. We didn't know if the data was accessed or exfiltrated. Here we have confirmation of that. So I think that's a good guidepost. Part two, has any of the data set been misused? And I think even if the plaintiff's personal information has not been misused yet, so are there other people who have had harms? I think misuse in that context is broader than just identity theft and fraud. McMorris actually gave, as an example, publication on the dark web would be a form of misuse. And, you know, I would agree with that. So, again, depending on the facts of the case, what type of misuse is out there? And then finally, the type of data at issue. Is it going to subject plaintiffs to a perpetual risk? Names, address, e-mails, more publicly available information or information? What's the perpetual risk? As you think about McMorris, right, in the context of the question on eminence, what's the perpetual risk, right? Your address, you went through this litany of personal information. It seems like what is the panoply of possibilities, right, as to how that could be used, right? You know, credit cards, this and that, right? But in the absence of any of that, how do we judge eminence? And you look at factor number three, a perpetual risk. You're asking us to say that eminence as it relates to perpetual risk, just it being there for however long it's there, that has to satisfy it, whether it's used in any way affirmatively or not. Whether we see a harm that arises from it, that's enough. Well, I think when you're talking about information that cannot be easily changed, I mean, Social Security numbers are very, very difficult to change. And you can do a lot with a name, address, and Social Security number. You can open up a line of credit. I mean, here we're talking about passport numbers, driver's licenses. Some of that can be changed, but the passport process is time-consuming, expensive. You have to have a reason to change a passport number. I think when we're looking— I beg your pardon. I just want to focus you. We're talking about perpetual risk. Okay, all of this information is gone. I change it. What's the perpetual risk? I mean, if you use my name, I suppose I can change that. I choose not to, but— I don't think it's as easy as I can change it. I mean, it's very difficult to change a Social Security number, and you have to be approved by the government to do that. Things like bank account numbers, new credit cards, yes, you can change that, but the process of doing that can cost time and money, like it did for our client. So if you're taking those types of steps to mitigate that risk, that is an independent, concrete harm in our view. And look, standing is assessed at successive stages of litigation. I mean, we're just at the pleading stage here. A complaint that was filed just a couple of months after the breach occurred. I think these are all issues that can be explored in discovery, and again, the district court can take it up later if it looks like there is no real risk and there's nothing to go to trial on. But again, the facts here, we've got multiple claims that we've already suffered injuries. In some of our sister circuits cases, there's been at least a couple of people who had experienced identity theft from the data set. You don't plead that here, right? We do allege that other class members have had misuse. But what does misuse mean? Well, you know, in this context, I think it's publication. I mean, our allegations say there have been other instances of identity theft and fraud. Those individuals are not identified. It's referring to other class members, however. So I do think that allegation at the pleading stage is plausible and can be taken as true. Unless the judges have any further questions, I can reserve any time if there is any, and if not, then thank you for your time. No worries. Good morning, Your Honors. Donald Houser with Alston and Byrd on behalf of FALE's Executive Army and Paracel International Corp. and the Amplice Corp. The district court correctly held that the plaintiff did not establish an injury in fact as required by Article III of the Constitution. To establish injury in fact at the pleading stage, the plaintiff must plausibly allege either an actual or an imminent injury, and the plaintiff here did not plausibly allege either. Sorry, Your Honor, but the district judge reached his conclusion, I believe, before the transunion decision, right? That's correct. Do you think he would have reached the same conclusion after transunion in its line that says the typically recognized harms for the basis of lawsuits in American courts include disclosure of private information and intrusion upon seclusion? Do you think the district judge would have reached the same conclusion? Absolutely. I don't think transunion helps the plaintiff. I think it cuts against standing because in that case, the court was addressing whether or not a violation of the Spare Credit Reporting Act was sufficient to give rise to an injury in fact. And what the court did, it began by noting that what is the irreducible minimum, the constitutional floor, is that there must be a de facto concrete injury for there to be Article III standing. And in the context where you're dealing with a statute, the way you go about deciding whether or not there is a concrete de facto injury is you look to whether or not the injury is closely aligned with an injury that's traditionally been recognized at common law. And I think you're right. The plaintiff picks up on this and points to the fact that they assert common law claims and that they allege a disclosure of information. But the risk of harm here based on unknown future criminal actors is the injury that the plaintiff alleged. And in the disclosure of information context, the types of injuries that have traditionally been recognized fall into two buckets. The first bucket is where the information disclosed is inaccurate. It's false. And that's the defamation. That's the reputational harm that Bucket 1 in the Supreme Court's Transunion case found, well, hey, this is analogous to that traditional harm. Bucket 2 is you have accurate information, but the information is so sensitive, such as sexual orientation, medical diagnoses. It's the camera installed in a private location that intrudes upon your seclusion. In those cases, there is an injury that arises when the information is disclosed. And here, the information that was disclosed was not highly sensitive like a medical diagnosis. This is transactional type data. This is your name, date of birth, social security number, financial account number. Isn't the point that many other courts of appeals have recognized is that the combination of that data lends itself to fraud, to identity theft. And that is the identity theft. If we look at that and the prospect of that as a concrete harm, then isn't the question for us just how likely is it, given all of the circumstances, including the type of data released and the circumstances of it, to make that concrete harm cognizable, sufficient for standing purposes? Sure. And thank you, Judge Krause. I think for Judge Sift's question, I don't think that imminence, that injury of the risk of identity theft based on the disclosure of information, that that is a separate concrete injury in and of itself. I think to your question, whether or not that risk that you may suffer identity theft at some point in the future, in the context of the facts here, where you have information that has been, at the end of the day, despite the sophistication of clock, which we don't deny, the information has been released. They refer to it as exposed, leaked on the dark web. And the risk that's at issue here is that some unknown, unidentified criminal is going to find that information, is going to download the information, is going to download plaintiff-specific information and then use plaintiff-specific information to commit some form of fraud, identity theft. And that is to, even though that information could, in theory, be used to commit identity theft, it's still that chain of ifs that still must be answered, just like in reality. Why isn't that a fair inference from what's polluted in the complaint here? I mean, unless you're going to require that there be proof of actual identity theft of this particular plaintiff, and you're not arguing that that's required, right, that there has to be actual injury, you recognize imminence is sufficient, right? Correct. For Article III standing, yes, imminence is sufficient. So what facts could be stronger than the ones here for imminence? Well, here, Your Honor, I think that it's a different fact pattern. It's a unique fact pattern because it involves this ransomware case. And it involves a situation where the information was, and it's pled in the complaint, it was extracted from execu-farm systems not for purposes of misuse. It wasn't extracted to go sell to be misused. It wasn't extracted to commit identity theft. It's alleged that it was extracted in order to exert influence to pay a ransom by execu-farm. That's a crime. So, yeah. Yeah. They're trying to extort it. That's a crime, right? So why in the answer to Judge Krause's question, isn't this enough? And part and parcel of that crime is that the threat to release it has to be credible, right? I mean, that's understood as part of the nature of a ransomware attack. Correct. It's absolutely a crime that was committed. But you have to look at what's the injury to the plaintiff. There's a difference between Article III standing for what constitutes an injury and what a person can recover in terms of damages, right? Like if a person's information is misused 20 ways, their damage claim might be a lot bigger than if it's misused in one way. But maybe Article III standing for intangible harms doesn't even require actual misuse in any way. The answer isn't that you would say there's no Article III standing. The answer is you'd say, I don't know what your damages are. I don't know why you brought this suit. Maybe you get some sort of nominal recovery.  But there's all sorts of kind of intangible harms. You know, it's like when I was studying for the bargain, they told me if you throw a rock over your neighbor's yard, that could be trespassing. And even if it never lands, I don't know if that's true or not under the law. I haven't thought about that since the bargain. But the answer to that was that's actual trespass. Just there might not be any damages. Why isn't the answer here, there's Article III standing, just the back end might be very, very, very small in terms of what recovery is. Sure. I think it goes back to the Supreme Court's Spokio, Thole, TransUnion. You have to have a de facto concrete injury. And the contract analysis or discussion I think is telling because you can have a breach of contract, and that is a private right, a legal right created between two parties. And there can be a breach of that contract, but there isn't necessarily a concrete injury in every circumstance. There can be a breach of contract where there is a breach of a right, but it's not the same as a concrete injury. And I think that you have to have something more than a – So in what instance do you – I mean, when I read TransUnion, I understand that the Supreme Court says that yes, there will be Article III standing for certain intangible harms. Just regardless of what comes your way afterwards. It just says these are the intangible harms. We don't care how much out-of-pocket expenses you have or how injured you are in any other way. Just this intangible harm is good enough for Article III standing. Do you dispute that? Are there certain just intangible harms that we don't have to look beyond to any consequences whatsoever to just say the fact that there was an intangible harm here is good enough for standing? Do you think that's wrong when the Supreme Court said that? Am I misreading TransUnion? No, I don't think that's wrong. I certainly agree that intangible harms like defamation could give rise to Article III standing. I think what the Supreme Court did not say, it did not say it wasn't assessing a data breach case where it was assessing whether or not the – I mean, it says disclosure of private information. I mean, that strikes me as a big category and data breach might be a subcategory within that one. I don't think the Supreme Court had to say data breach because they say we're looking to whether it has a close historical or common law analog to their injury and they said disclosure of private information. So it strikes me that data breach seems to be decently analogous to that, right? Respectfully, I don't agree, Your Honor, in that the court's analysis did not turn on when it was describing other sorts of potential intangible injuries. What the court was saying was, look, in assessing whether or not there is an injury, in fact, you have to look at whether there's a close connection, not just a decent connection. And I think that applying an amorphous, well, it's a release of information generally and that's analogous to a traditionally recognized harm isn't that close connection that the Supreme Court would be envisioning in particular with the data breach case. And so I don't – So this is what I'm struggling with, right? TransUnion, at least as I read it, the Supreme Court recognizes there can be standing for intangible harms. That means harms before they become tangible. Before someone has their credit card stolen and run up on them. Before there's been identity theft. Once those happen, the harm has now become tangible. But at least what TransUnion seems to be saying is we recognize sometimes they're standing for just intangible harms. But what you seem to be saying is that, no, there is no tangible harm, therefore there's no standing. But as I read TransUnion, it leaves the door open that there can be standing for just intangible harms before there's a tangible manifestation of that, such as destroying someone's credit or running up their credit card. So I guess my thought is, again, am I misreading TransUnion? Is TransUnion just kind of saying that, no, when we said there could be intangible harms, there really has to be a tangible consequence? Well, I think that what TransUnion was starting with was it went to the idea, well, there can be intangible harms and those can be concrete for purposes of Article III standing. And I think the defamation example would be one of them. And when deciding whether or not that intangible injury is a sufficiently concrete harm, a de facto concrete injury for standing purposes, one of the tests you look at is you look at what's been traditionally recognized at common law, whether that injury is traditionally recognized at common law, to the extent TransUnion is applying outside in this context in any event. And our argument is that the release of this information, when you look at what's traditionally been recognized as an injury at the common law in the two types of categories of releases or disclosures of information, it's not sufficiently connected to or analogous to traditionally recognized injuries such that that intangible harm is a concrete de facto injury for purposes of Article III standing. But you recognize that intangible harms can be article sufficient for Article III standing purposes? Yes. Let me ask you this question along those lines. The information that is involved here, I won't go through the litany, but the key for me is bank information, financial account information, insurance tax information, right? So that's being disclosed. Now, I'd love you to share with me what your thoughts are on the dark web because I'm thinking about it hypothetically because I don't know. There's no other purpose than a nefarious purpose for something being on the dark web, and we know that it has to be nefarious because there was ransom sought and the punishment for not receiving the ransom was putting it on the dark web. Now, when you talk about intangible harm, and it doesn't seem to me that transunion is inconsistent or abrogates Susan B. Anthony List, and if that's so, then you know a substantial risk of imminent injury is enough. So tell me, what am I missing here? Also, in this space that you think is enormously narrow of an intangible harm that would be sufficient for standing, what would you place there? So I've asked you a couple of questions. I apologize. It's fine, Your Honor. Take your time. The dark web, it is a portion of the Internet that we do not dispute. That is a portion of the Internet that's frequented by criminals, but it is a portion of the Internet where, as you can think of, the Internet writ large is where both non-criminals and criminals go, but this is dedicated to criminals, the dark web. Now, we don't dispute that. Our argument or our point is it's been released on the dark web where it's possible that another criminal would go to the CLOPS leak site and download the information and download plaintiff's information and then go through this series of hypotheticals and ultimately cause harm to the plaintiff. But in response to Judge Krause's question earlier, the question is, at one point, in your view, is there injury sufficient for standing? And it sounds like what you're saying is, in that continuum, there can't be injury unless one of the criminals surfaces and exposes not just themselves but their intention and then actually steals something or uses the information in some way that is tangible. But that seems antithetical to the questions of both of my colleagues and myself about the recognition that the Supreme Court and our court has made that intangible harm for purposes of standing is sufficient. Sure. I think that when we're talking about the data breach context, we're talking about a specific application of Article III standing to a unique fact pattern where the intangible risk of the harm is dependent upon third-party criminal conduct. So in this context, particularly where we have facts here that the CLOP isn't intending to misuse it to commit identity theft or fraud, under these facts, this is not the type of, you have to have something more than, I may be harmed at some point in the future, even though it's on the dark web, it's not enough for Article III standing. Why isn't the breach of a right that is long recognized as common law sufficient? I mean, the argument you're making would seem to suggest that a negligence claim would not be cognizable if the only thing that followed, for example, was as a result of that breach, someone experienced emotional harm after the fact. Well, I think that what the plaintiffs are, let me take a quick step back. In Riley, Riley also involved common law claims, and there was no discussion at all that simply by asserting common law claims in Riley, including breach of contract, that that in and of itself would give rise to Article III standing. That was about imminence. We weren't addressing concreteness the way we are in these questions. And in imminence, I think you'd agree, we have very different facts here as to the likelihood that there would be some other use of this information. But in Riley, just to pick up on Judge Krause, we also said what would satisfy it, right? And that was Tiziati. I'm pronouncing it wrong. Someone will correct me. A Seventh Circuit case, and Judge Aldersert said that in an instance where there was evidence that the hacker's intrusion was sophisticated, intentional, and malicious, that would be enough. Now, in Riley, it wasn't. This is a different case, a different set of circumstances, and it would seem to fit what Judge Aldersert foresaw at the time would be sufficient. I think that goes in with exactly what Judge Krause is asking about. So help me, if it was foretold ten years ago, this would be an instance that would be good. It seems that we have that here. How is it not? Your Honor, I know that the Riley Court definitely distinguished those cases to say that that is not the fact pattern presented in Riley. But I think there are three components of Riley that are analogous that I think help answer that question. That case involved a hacker. The Court described it as hackers. The parties described it as hacking. It also involves Social Security numbers and financial account information. Now, there's a distinction in Riley in that it was not known what happened to the information. Was it disclosed? Is it in the hands of criminals? Was it ever taken one way or the other? Unknown. And here, the answer to that question is pled that it is released on the dark web, but the intention is not for CLOP to misuse it. It is simply that now other unidentified criminals may misuse it in the future. So I still think Riley's analysis, which is really what got Riley to that conclusion, the series of ifs, it still goes to the – it answers the question here in this case. But why do we care about the subjective intention of the perpetrator? Isn't our analysis as to the eminence and concreteness of the harm? We're looking at the objective risk to the victim, right? Well, I think the risk to the victim must be – there must be a substantial risk or the risk must be certainly impending. And I think the series of ifs and the series of speculations and hypotheticals go to answering that question, whether or not it is certainly impending, whether or not there is a substantial risk of harm. Let me just pick up on Judge Cross's question two or three questions ago where she inquired about traditional tort claims, emotional distress being a valid injury. No one said that's not a valid injury. And here in the complaint, they allege that they suffered anxiety and emotional distress. And those might not be pots of gold at the other end of the rainbow in terms of damages recovery, but if a person says, yeah, I've experienced a lot of anxiety and emotional distress, there are tort claims where the only claim is for emotional distress often in the forms of anxiety. There's negligent infliction of emotional distress. Some states recognize intentional infliction of emotional distress. Surely just an allegation at the pleading stage that a person is experiencing right now, not later, but right now anxiety and emotional distress, if this were – I mean, that's good for those torts, right? That gives Article III standing for some torts. Why doesn't it do it for these torts? Well, I think a couple of notes here is that you know that they have six substantive claims putting aside declaratory relief. If you look at the injury that is in those particular accounts, it is all based on the risk of future harm, right? And if you look at all of the mitigation efforts, all the money that they claim they spent was based on that risk of future harm. The emotional distress that the plaintiff alleges is based on that risk of future harm. And if the risk of future harm in and of itself is not a cognizable injury for purposes of Article III standing, everything that flows from that risk does not in and of itself create Article III standing. So we take for certain that they are experiencing anxiety at this stage of the pleadings, right? We just take that. We give that its assumption of truth. And what you're saying is that anxiety and that emotional distress, because it seems to be tied to a future event of greater harm, is not sufficient for Article III standing? I think that's correct in this case. And the Supreme Court in Clapper noted that in the mitigation, so not emotional injury, but mitigation efforts, that they may be very reasonable. They may be objectively reasonable. But if it's not to mitigate a non-speculative risk, if it's not to mitigate a risk that provides standing, then it's not compensable. And I think that same analysis applies with equal force here, because in every data breach case you could allege some anxiety, stress, and then that would always give rise to Article III standing. And I don't think that's a correct result. So what if we agree with you that, as stated, it's really a risk of future harm, of identity theft, that would give rise to liability here. How is there not, with the exfiltration and posting on the dark web of this kind of comprehensive information, a substantial risk of identity theft? Your Honor, it's because I think there's a timeline in my view in terms of what happened here. And there is allegations about the sophistication of cloth and the level of information that is exfiltrated. But then you get to a point where it's simply available. And despite the fact that it is sensitive information, which we don't dispute, the fact that it is available for others to misuse, I don't believe that gives rise to a certainly impending risk that someone's going to actually use it. And I think that's the experience of the vast, vast bulk of the U.S. population that have been exposed in data breaches and haven't. Short of actual misuse, how much closer could you get to imminence than the posting of that kind of comprehensive information on the dark web? You could certainly get closer to it, Your Honor, if, and I'm not saying it would be enough for standing, but if they stole that information and then there was allegations that they were selling it to criminals who were committing identity theft and fraud, and if there were allegations that plaintiff, for instance, had a, you know, someone trying to open up credit in her name, those. That's been the actual, right? Right. But we're talking about imminence. And why does it matter whether they sold it to criminals on the dark web or they posted it for free? Why does that change the imminence of that harm? Posting it for free seems more imminent, just to follow up. Well, I think you have to look at, you know, again, we're talking about the dark web where it's made available, and I think you have to look at why is the hacker obtaining the information. And in all the courts or the cases that McMorris cites, that the plaintiff cites in their brief, where the hacker is unknown, the intent of the hacker is really used as a proxy for the risk of future harm. And the assumption undergirding that analysis is that, well, if the hacker intended to steal it, then that hacker must be intending to misuse it to the detriment of the plaintiff. And that's why McMorris cites the Neiman Marcus decision, which makes that same point. But here, that analysis falls apart. We know the intent of the hacker. We know why they took it, and it wasn't to go and commit identity theft and misuse the information to the detriment of the plaintiff. It was to extort the ransom from ExecuFarm. They did release it on the dark web, but I think that's fundamentally different than even in those cases that the plaintiff cites McMorris. You're not answering her question. It's a wonderful answer, but you're not answering her question, right? So what she asked you was, what's the hypothetical short of actual injury that satisfies the imminent injury that all of the cases that we've thus far discussed would say is permissible and standing would occur? So what is it short, then you're on, right? So you said, oh, criminal gets on and criminal sells it, right? So that's actual. The judge said that. Now my question to you, which is her question, what short of that satisfies imminent injury? Because that's not imminent, that's actual. Well, I think there could be facts alleged, and it's difficult to think of one, because I don't think that just the theft of information alone, but if the criminals were stealing the information and there was some facts, whatever it was, that it was certain that those criminals were planning to actually use the information, I don't know what those facts would be, then potentially you could get to the point of imminent. I can think of both. That's what we'd like you to think of them, because that's the problem here, right? Because if what's happened here, right, is short, as you've professed, of imminent, it's not clear to me. I won't speak for my colleagues. It's not clear to me what would be. So that's why I want you to help me. Well, I think that's the rub here. That is the application of imminent in the context of a data breach case. But isn't there imminence just by the fact that they ask for a ransom? I mean, someone asks for a ransom. You don't say, hey, we've got all your information. We'd like a ransom and we'll give it back to you. No one's going to pay the ransom if you just say, oh, and then we'll just keep it to ourselves and never use it, right? No one pays a ransom under those. Oh, you have all our information? You're just going to keep it yourself, never, ever use it? That's not how ransoms, at least as I understand it in this context, get paid. You have to say, oh, we've got all your information. The reason that you should pay us is because you aren't going to like how all that information gets used someday. And if you can't kind of say, hey, it's going to get really, really misused or at least there's a potential for that, an imminent potential for that, then who's going to pay the ransom? Well, I take your point, but I think that there is an interest in not having your data, including information on your current and former customers, released on the dark web. That doesn't necessarily mean that, well, I'm only deciding I want to not have it released because it will create an imminent risk of harm. I don't think that you certainly don't want it released. There's a business interest and you don't want it released. It could lead to bad publicity for your company. You have to provide notice. I guess what I'm saying is in answer to Judge Greenway's question where he said you could take as long as you want, I interrupted the time that he was giving you to posit this. Once a ransom is requested, can't we infer, at least at the pleading stage, that there's imminence? Because a person does not come with goodwill and say we're only going to use it for good purposes or we're going to keep it safe. We just didn't think you were keeping it safe enough. We're going to keep it safer. We'd like a ransom. That's not how ransoms work, at least as I understand them. The answer is we have a ransom because it's better for you to pay us our demands than to endure the consequences of what we're going to do with this information afterwards. That strikes me as those consequences seem just so interwoven with the fact that there's a ransom request. Otherwise, no one would ever pay the ransom. So you're just going to keep it fine? We don't want to pay. Right. Well, I certainly agree that the company does not want the information released, but I have to go back to the idea that simply because it is a ransom and simply because the criminals are going to release the information, I don't equate that to necessarily when that information is thereafter released that that creates an imminent risk of harm. And the fact that the ransom only works because the company doesn't want their information disclosed isn't tantamount to whether or not if it is ultimately leaked equals imminent injury for purposes of Article III. Can we go back to the nature of the injury for a moment? Let's say, following up on Judge Fitzgibbon's question, let's say we just stop at the moment in time where there's the request for the ransom, the ransom is paid, and there is some assurance, credible assurance, that this information will never be used beyond those at clock seeing it. In that circumstance, if an employee learning about this were to bring an action for negligence for an employer's failure to maintain sufficient security around personal data, that it was used without their consent and alleged that it caused them emotional harm, is it your position that there wouldn't be standing to bring that negligence claim? That's correct. If the hacker returned the information and there was no injury to the plaintiff, even putting aside the emotional distress claim, what is the injury based on the fact that the hacker had the information, but then gave it back and you're back to the status quo, then that would not be a sufficient injury that would enable you to have Article III standing. Why isn't the injury the violation of the duty that's owed under the common law? Because the Supreme Court in Spokane and then most recently in TransUnion made clear that a violation of a legal right, and so maybe there's a legal right to not have it disclosed, isn't necessarily the same thing as a de facto concrete injury, and so you still have to look at it. It's the same thing with the contract argument. You have to still look at whether or not there's been a concrete de facto injury, and I don't think that there would be a concrete de facto injury if the information is exposed but then comes back. You're reading those cases very broadly. Why shouldn't we think of them as limited to the analysis of statutory rights where the court is saying if Congress is going to just prescribe out of the blue something that doesn't have any roots in the history and tradition of the country, that a mere procedural violation, some violation that doesn't have that kind of common law tradition behind it, will not provide standing? But where we're talking about common law claims to begin with, why should that be so? Why do we need to look for analogs in the common law to a common law claim? Well, I think that there is the discussion of what is required for standing in Spokane, TransUnion, and Stoll doesn't apply only to those constitutional requirements. There's no basis for distinguishing between a federal statute and a common law claim. Common law, they're still including issues of federalism at play because why couldn't the state legislature declare that any time you give information to a third party, that's an implied contract? And so therefore, a breach of that, the data, the disclosure of the data gives rise to a contract claim. You would then be giving the state the power to decide what is an injury in fact for Article III standing purposes. So I don't see a basis for saying that common law claims or state law claims should be treated differently. I think that if it's a duty that's breached under common law, federal law, state statutory law, there still must be that irreducibly, that constitutional floor of an injury in fact. And I think that Stoll's case from the Supreme Court, it is an ERISA case for sure. But the court described that the rights in that case as being contractual in nature. And it still held that there was no injury in fact even though there was a violation of those rights that were contractual in nature. That's an analogy where there was not a breach of contract. It certainly doesn't speak to what happens where there is a breach of contract and it's a common law claim. Well, it is analogous. But I think that what we would be saying then is whenever a common law claim is asserted in a data breach, regardless of the risk of harm, then you always have standing. And there's been, again, Riley had common law claims asserted that courts have held that there's no standing in cases where they also include a common law claim for like breach of contract for instance. And oftentimes it's not addressed. That argument has not been made in many of the cases. But it would mean that a lot of the cases were potentially wrongly decided that whenever you assert a contract claim or a common law claim, you automatically have standing. It's just very weird to me that state courts would develop common law causes of action over centuries. And then federal courts would say, yeah, your centuries of work is not what federal courts are about. Your centuries of work, we are not going to recognize that as federal claims because those aren't cases or controversies for purposes of what federal courts handle. It strikes me that if the common law develops a claim, that really does feel like it would probably be a case for controversy, at least for purposes of federal court. And it strikes me that the only way around that is a rule of law that says not everything that was recognized at common law is a case for controversy, is a case for controversy when the Constitution said it in 1789, used the words case for controversy. It would be very strange at one level to read the Constitution saying its reference to case for controversy was different than the common law understanding of case for controversy. Well, I think that at the end of the day in Dole, the Supreme Court said, look, it doesn't matter what cause of action you select. Labels don't matter. There must be a injury in fact. And even if you were to apply that, is it traditionally recognized at common law? I don't think that the risk, the injury here, and it all goes back to this risk of future harm, the disclosure of this type of information potentially leading to unknown criminal actors is closely analogous to what's been traditionally recognized as an injury at common law. So I think it can be squared with the fact pattern here such that you're not leading, or it doesn't lead to kind of an anomalous result as you've described it. So for common law claims, including breach of contract, if the only damages would be nominal damages, there's no standing to bring the claim in your view? I think that's a legal right to recover nominal damages, and that goes to redressability, not whether or not there has been a concrete injury. Just like a federal statute that might provide, like the Fair Federal Reporting Act might provide for statutory damages, the entitlement to those damages wouldn't necessarily mean you have a de facto concrete injury. So I don't think that the provision for nominal damages would create an injury for purposes of Article III. I just want to ask you a little bit about the contract claim, because that... And we had skipped over that, but I think we'll hopefully have time to come back with Mr. Moore. With contract claims, as I understand it, your position is that there would not be standing to assert a breach of contract unless there was a direct loss of money in the contract? Is that how we should think about your limitation on standing for breach of contract claims? No, I don't think that you can recover if you, for instance, there is the plaintiff's site, the GameStop case, the Coons case. In both of those cases, the parties had contracted for a subscription service, and there was a breach of that contract, and the court found, look, you didn't get... You paid the money, and you paid making this up $10, and you didn't get $10 worth, and therefore you've suffered an injury, and that is you have standing to pursue that contract claim. Here, I think the problem that we see with the contract claim is it all goes back to, well, what's the injury? And it can't be that, well, for the negligence claim, no standing if the injury is at risk of future harm. But now I'm going to call it a breach of contract, and looking at, well, what's the injury? Well, it's the same injury, and that is not a concrete injury for purposes of Article III. So that's our problem with the contract argument. You still have to have some sort of de facto concrete injury, and it can't be that just because you assert a contract claim in a data breach case and that the common law has traditionally recognized contracts that there is an allegation of a breach of contract that's therefore standing. Why isn't the denial of the benefit of the bargain the injury? I mean, that was procured in exchange for some consideration. That's our law for the creation of contracts. So why isn't the denial of the benefit of the bargain itself an injury for purposes of standing? Well, if you had a – first of all, the plaintiffs don't allege that that's not what their injury is with the breach of contract. They don't say that we didn't get the benefit of the bargain. They didn't say their consideration, you know, there was consideration and they didn't receive the consideration. They allege that there was a contract, an employee contract, and that the breach of the contract led to this risk of harm. So it's different than paying someone for security, and there could be a benefit of the bargain, and that benefit of the bargain, if it were alleged to the parties didn't receive the benefit of the bargain, that could be a de facto concrete injury. But that's just not the injury that the plaintiffs are alleging here. They're not alleging a failure of the benefit of the bargain. They're alleging that they've been injured because they face a risk of future harm. Aren't they alleging I was required – I was asked to turn over my private information in exchange for the assurance that it would be secured and treated confidentially. I did so, and they didn't live up to their end of the bargain. Why isn't that the nature of the breach of contract claim alleged here? I don't think that that's what they're alleging their injury is, is the failure of some benefit of the bargain. I think the injury, again, going back, is this risk of future harm, and it's not a concrete de facto injury, which is why we take issue with the idea that whenever you have a breach of contract, you can always have articles of responding. So you would remove from the federal docket all of those breach of contract cases that are involved in diversity where there's not some expressed loss of funds. Even if the exchange between the parties was for something that, while has no market value, they've agreed to some value over $75,000, for example. If they're data breach cases, absolutely, and if the injury is just the breach of contract in and of itself, which is the plaintiff's argument, is that the contract, the bare violation, the bare breach of the contract, that's an injury. I do not believe that that is what the Supreme Court has held is enough for Article 3 standing. Thank you so much. Thank you. Thank you. Can you start addressing the contract claim? And just taking a step back as regards that claim and maybe many of the arguments that have been made by your colleague on the other side of the aisle, that if we are to recognize standing for the mere disclosure of, non-consensual disclosure of data as a result of a data breach or breach of some implied term that information would be maintained securely in an era where there are data breaches of tens of millions of us, OPM included, that we just open up floodgates to liability for every company that runs using a database. Well, look, I mean, it depends on the relationship of the parties and whether they have an agreement. Is there a meeting of the minds on this point? So if I go shopping at a grocery store and my credit card information is breached, did I have a contract with that grocery store that they would protect it? I don't know. That's probably a closer call because those implicit contracts, you really have to look at the relationship. Here we have an express written agreement, and this was an employment contract. The company will take appropriate measures to protect the confidentiality and security of all personal data. That's an express promise in this contract, and it's long been the rule of common law. A breach of contract claim accrues at the moment of breach. The injury, for standing purposes, is the breach itself. So when my colleague argued that all of our claims are based on future harm, that's just not right because the injury is the breach of contract. They did not live up to their promise to protect that data. What are the remedies? Well, this one's easy because she also has monetary damages flowing from the breach. She spent money as a result of the breach. So it's not a close call here. Well, before we get to questions of damages, with your contract argument, you seem to be saying that if private parties decide between them to conjure up a legal right, that we're going to give that more credence than we do when Congress promulgates a law that gives an individual citizen a right. How can we do that with case law that says that we shouldn't distinguish between the different sources of information for standing purposes? Well, you know, the entire first half of the transunion decision is addressing one concept, the separation of powers. The Constitution limits what Congress can tell the judiciary it has to do. It limits what Congress can say the cases the judiciary has to hear. So there are unique constitutional concerns when you're talking about a law passed by Congress and whether that law, the harm that results from a violation of that law, reaches the level of concreteness. But I think transunion explains this because they say when we're looking at what's concrete, we look to common law. We look to historical practice. Historically, breach of contract claims for 200 years, if I've got a contract with the party, the party breaches it, I can go to court and seek redress. If I don't have actual damages, if the court finds there's a breach, but the jury finds, I'm sorry, the jury finds there's a breach but doesn't find actual damages, black letter of Pennsylvania law, the plaintiff is entitled to recover nominal damages. So this is a type of claim that's always been recognized. The Supreme Court did not change any of that in its recent opinions because it's relying on the common law to determine what a concrete harm is. I'll note. Is there a circumstance in which we disagree with you on your main claim but let the contract claim go forward? Because what your adversary was suggesting is that there are, he didn't use these words, but they're essentially inextricably entwined, right? And we know in Riley, the contract claim fell by the wayside once the key identity issue also went by the wayside. So help us with that. Yeah, I don't think they're necessarily linked. I think they're two separate claims, and you have to look at it from a different perspective. For negligence, it goes back to that restatement principle that I can take reasonable measures to protect myself from further harm, and that's recoverable. In the breach of contract space, I spent money as a result of the breach. So I think it is a different idea. In Riley, the Third Circuit did not address the breach of contract claim. But I'll note, the plaintiff and the defendant, they didn't have a direct relationship. This was a vendor for the plaintiff's employer in that case. And, you know, I don't think it was brief. I don't think it was addressed. So it's hard to lend a whole lot of credence to, I guess, why that claim fell by the wayside. But here, you know, we have a written agreement that's referenced in the complaint. And I'll note, you know, on the point that, you know, well, it's not enough for imminence in a negligence claim, so it can't be for a breach of contract claim. That doesn't really follow for me. And I think what my colleague said at the outset of his argument was imminence is sufficient for Article III, but then could not give another example where, in a data breach context, the harm would be imminent, right, if this one doesn't qualify. If this case doesn't qualify, then what would? I don't think he could answer that question because you can't get more imminent. And they relied a lot on the fact that, oh, well, CLOP, the motive of CLOP was just to extort a ransom. But they don't want to misuse this data in any other way. I don't see how that's a plausible inference from the complaint. This is a well-known hacking group. We don't know how many people it is. Is it one, two, or a thousand? They got access to this data. The ransom wasn't paid. Why wouldn't they want to use the information for a financial gain? The entire purpose of the hack was for a financial gain. Now, yes, they made it available to others as well, but I just, I don't think that's an inference you can draw, the motives of CLOP at this stage of the proceedings based on what was alleged in the complaint. I guess we're scratching our heads some on this because when we think about the nature of the injury that we are supposed to be assessing for purposes of imminence and concreteness, you can look at it close up as just the breach of the legal duty. And there we've got some tension with TransUnion if the duty is one that's created by statute. Or you can look, take the longer-term view of the harm is the misuse in terms of identity theft here. And that's what we're assessing. That by its nature seems concrete. You can certainly describe that as a distinct type of harm.  But where in that continuum we should be looking for what the nature of the harm is with the case law that we have to work with. Right. And, you know, that's sort of a criticism I have too, which is a lot of these cases haven't done the claim-by-claim assessment. Because I do think the harm here can differ depending on the nature of the claim. The privacy tort, the breach of contract claim. You know, the privacy tort, the second the information was disclosed, and Judge Phipps noted this, TransUnion could not have been more clear. That's an intangible harm recognized at common law. So that's an actual injury for that claim. For negligence, do you need something more? Can you rely just on imminence? Potentially, yes. I think in our case it's easy because she has monetary damages that are flowing from what's clearly an imminent risk of harm. But it's going to depend on the case and the claims. And, again, I don't think every case will have a breach of contract claim like this. I don't think that's a loophole, as it was referred to in the appellee's briefing. You've got to look at the nature of the relationship. And is there an agreement? Is there a meeting of the minds? Here, there's no question. So if that contract is breached, that is the injury for purposes of that claim, which may not satisfy other claims. Why wouldn't that bootstrap every data breach claim into a, per se, cognizable contract claim? I mean, you know, in the sense that if someone is induced to relinquish personal data, it's with the implied understanding and implied term that it will be properly safeguarded. You know, we litigated the Equifax data breach case. It was 147 million people who had their information maintained by Equifax, and that was leaked.  We don't know where it wound up. But scanning, you know, was easily found in that case. The vast majority of those class members had no direct relationship with Equifax. A lot of them had never heard of Equifax. I think under facts like that, it's difficult to say that they had a contract. I've got another case pending in New York where, again, kind of like Riley, it was a vendor. There was a party in between the plaintiff and the defendant who lost the data. There was no direct relationship. We were not able to sustain a breach of contract claim in that case because the parties didn't have the relationship to support it. So can I just get into one one-off hypothetical fact? Sure. If Executive Farm would have paid the ransom the moment that Clough asked for the ransom and got all the data back, would you have standing for any of your claims? Because the contract would still be breached under those circumstances. I think there would be a breach of contract claim because they failed to protect it, which is what they promised to do. So their internal security methods were insufficient. I think the private-sector claim would still be viable there because a third party gained unauthorized access to that information. So we're really in the pure intangible harm space because under those circumstances, at least as I'm trying to construct the hypothetical, there's zero tangible harm that's ever going to come. And so what it suggests to me, though, is if in those circumstances the intangible harm is sufficient, then we're green lighting, if we agree with you, data breach standing basically regardless of any downstream consequence. Because if paying the ransom an hour later, in full and getting everything back, still gives standing, then really that's just as close to an across-the-board rule as there is. And maybe that's in your interest to want an across-the-board rule. But I don't know how you could say that paying the ransom and getting everything back, they're still standing while also saying, and maybe you aren't, that there's any limit to standing. Yeah, and I do think with the claims I mentioned, breach of contract, the privacy tort, you still have to have the relationship with the defendant to support that claim. You still have to meet those other elements. So I don't think it's going to work in every case. I think your hypothetical is imminent enough there. Well, can we trust that the hacking group, they paid the ransom, then they destroyed the data? I mean, it just really depends on the facts of that case. What do we know about who received the ransom payment? Is there a plausible inference that they could misuse it? Have they done this in other cases? Again, I think it's just going to be case by case, but it raises interesting issues, absolutely. So I want to play with Judge Fitz's hypothetical. Here we're dealing with the dark web. I'm not great on the whole social media thing, so my clerk helped me on this. Let's say it was posted not on the dark web. It was posted, this information, I know it's burdensome and it might not make sense in the context, but let's say you put it on Twitter or something, or you put it on one of the ways in which we communicate that is totally above board, legitimate, and so forth. So there may be some viewers of the information who have nefarious intent, but certainly not the majority. Is that a different case? Because I'm trying to figure out, you've asked us for a case-by-case determination, and obviously you've relied on the fact that this is on the dark web. In the circumstance that I, and you can play with my hypothetical if you want, but the circumstance I want you to address is one in which the information is put in an otherwise legitimate, above board environment that everyone in this courtroom would have access to. I think once confidential data is in a public environment, there's a major risk of harm, no matter what that public arena is. I do agree the dark web, and my colleague acknowledged this, that that's a haven for criminals. People who are surfing around there are looking for this type of data to misuse it. But say it's released on Twitter, gigabytes of data with personal information. One person takes it and puts it in a spreadsheet, sells it, distributes it. I do think once that publication occurs, we're talking about a very real risk of harm, because in most cases, the data is stolen. We don't necessarily know where it goes. We don't see the sale. We don't see that underground transaction. We think it may be sold in underground markets. It may not be posted as publicly as this was. And we have to make those inferences. I think once publication occurs, it's much easier to say, look, that information is now out there and can be misused by any number of people who could get access to it. So even if it's disclosed in what I'll just, for these purposes, call a public forum, injury is imminent in your view? I think in your hypothetical, I think compared to the other fact patterns we've seen that have found imminence, that would certainly qualify. You would agree that even with these breach of privacy, there wouldn't be standing without either some kind of emotional harm or some type of monetary damage, which might include a diminution of value of the information. But there has to be something that is the hook to get to all the other foreseeable damages that might follow from that. Right? And you're referencing just your sort of privacy towards like the breach of confidence claim we assert here? No, I think the injury is what the Supreme Court just said, is the unauthorized disclosure. And what the Horizon case says when looking at this very issue is, look, privacy damages are just, they're very difficult to decipher. They're difficult to quantify. So I think the fact finder determines what that is worth. But I think those concepts of diminution in value, stress, anxiety, I mean, that all goes into determining what that is. Do you have to have those in order to have the violation? I would say not necessarily. So a plaintiff could come to court and plead in the complaint that this happened. There was this duty. There was this breach. And I don't care, other than it invaded my legal right. It didn't cause me any emotional harm, psychological harm, any monetary damages. But I'm just irritated that my legal right was violated. And that would be enough to proceed with a claim. Yeah, I look at it like the breach of contract claim as well. I mean, if you have that relationship and you have that agreement and it's violated, yes, that's a concrete injury you could come to court with. Are you going to have a persuasive case before a jury? Probably not. But, yes, I think that would be sufficient to qualify as a concrete injury. But breach of contract is different, isn't it, in that to give rise to that claim in the first place for there to be a contract, there's already been some value that's ascribed to the other side of the bargain. Consideration does that work. That's right. That's right. So I think that's a good point. The breach of confidence claim also requires a relationship where you are providing confidential information to a party that you're expecting it to be maintained confidentially. So there's maybe some similarities within that relationship. But if they fail to protect it and they improperly disclose it, that is an intangible harm recognized at common law. Okay. All right. I think you better run, then. Thank you so much. We appreciate the arguments of counsel, and we'll take the matter under advisement.